## 5271.　McEACHERN, executrix, *v.* NEW YORK LIFE INSURANCE COMPANY.

1. A life-insurance policy was issued in consideration of certain premiums to be paid annually on a specified date, and subsequently the insurance company made a loan to the insured in accordance with the terms of the policy, interest to be paid annually in advance. To secure the loan the insured assigned and delivered the policy to the company as a pledge, and also executed and delivered to the company a loan agreement containing the following foreclosure clause: "That said loan shall become due and payable—(*a*) Either if any premium on said policy or any interest on said loan is not paid on the date when due, in which event said pledge shall, without demand or notice of any kind (every demand and notice being hereby waived), be foreclosed by said company by deducting the amount due on said loan from the reserve on said policy, computed according to the American Experience Table of Mortality, and interest at the rate of four and one-half per cent. per annum; and if after said deduction there is any balance of said reserve as so computed, said balance shall be taken as a single premium of life-insurance at the published rates of said company at the time said policy was issued, and shall be applied to purchase on the life of the insured under said policy, at the age of said insured on said due date, paid-up insurance for such amount as said balance will buy, payable under the same conditions as the original policy," etc. The insured defaulted in the payment of interest on the loan and of premium on the policy. *Held*, that upon such default the pledge was not automatically foreclosed in virtue

of the terms of the loan agreement; and that a foreclosure of the pledge required proper affirmative action by the company, sufficient to show that the pledge was in fact foreclosed in accordance with the stipulations contained in the loan contract.

2. The insurance company having failed to exercise its right of foreclosure prior to the death of the insured, whereby the policy became a death claim against the company, it could not then change the status quo by foreclosing the pledge in the manner stipulated in the loan contract, and thereby deprive the decedent's legal representative of any valid right of action on the policy that had accrued by reason of the death of the insured.

3. Where a life-insurance policy, payable to the estate of the insured, contains a non-forfeiture clause providing that after the policy has been in force three full years, if any subsequent premium is not duly paid the policy will be indorsed for the amount of paid-up insurance specified in a table thereto attached, less the value of any indebtedness on the policy, provided demand is made therefor, with surrender of the policy, within six months after such non-payment, or if the policy is not so surrendered the insurance under the policy will, after payment of any indebtedness, be extended without request or demand therefor, for the full amount, during the term specified in a table on a preceding page, the privilege of election between two benefits thus guaranteed to the insured by the terms of the policy, after lapse for non-payment of a premium, is a property right, and when the insured, without having exercised such right of election, dies before expiration of the period within which election should be made, such privilege survives to his legal representative.

4. While the policy, after lapse and during the period allowed for election, was not in force as primary insurance, still it was in force to the extent of securing to the insured the secondary insurance therein guaranteed; and the insured having died before the expiration of that period and before repayment of the loan referred to in the preceding paragraph, the policy being payable to his legal representative, his executor, upon proofs of death, and demand made in due time, was entitled to recover on the policy the amount of the extended insurance therein guaranteed, less the amount of the loan.

5. The policy having matured as a death claim, repayment of such indebtedness from other funds was not a condition precedent to recovery.

DECIDED SEPTEMBER 22, 1914. CHIEF JUDGE RUSSELL BEING DISQUALIFIED, JUDGE GRAHAM, OF THE OCONEE CIRCUIT, WAS DESIGNATED TO SIT IN THIS CASE.

Action on insurance policy; from city court of Atlanta—Judge Reid. September 17, 1913.

On October 22, 1898, the New York Life Insurance Company issued a twenty-annual-payment-policy on the life of Robert A. McEachern for $10,000, payable to John H. McEachern, father of the insured, or "in the event of his prior death, to the insured's executors, administrators or assigns," etc., in consideration of the

sum of $489, to be paid in advance, and "of the payment of a like sum on the 22d day of October in every year thereafter" during the continuance of the policy, "until twenty full years' premiums shall have been paid." Certain privileges were guaranteed by the terms of the policy, under the head: "Special advantages." Under this heading was a "table of loans and surrender values," showing the amounts that would be loaned on the policy, and the amount of paid-up insurance and extended insurance to which the insured was entitled at the end of each year from and after the end of the third year. According to this table, at the end of the tenth year the loan value of the policy was $3,600. At the end of the thirteenth year the loan value was $5,420, and the insured was entitled to paid-up insurance to the amount of $6,500, or to have the policy extended for seven years for $10,000. With reference to loans, the policy contained, on the page following the table above mentioned, these stipulations: "The company will make advances to the insured as loans on this insurance bond within the month of grace allowed in payment of premiums, on application to the home office, at the third or any subsequent anniversary of the insurance, within the accumulation period, under the terms of the company's loan agreement then in use, and the following conditions: First: That premiums have been paid in full to the time when the loan is made, including the premium for the entire insurance year then beginning. Second: That the amount loaned at any time shall be such as the insured may desire, not to exceed the sums shown in the table on the preceding page. The amount of any loan shall include any previous loan then unpaid. Third: That this insurance bond shall be duly assigned to the company as collateral security for the loan, and deposited at the home office. Fourth: That interest in advance at the rate of 5 per cent. per annum on all loans from the date of the loan to the next anniversary of the insurance, and annually in advance thereafter, if the loans are renewed, until they are paid off." Next came a non-forfeiture clause, as follows: "This insurance bond can not be forfeited after it shall have been in force three full years as hereinafter provided: First: If any subsequent premium is not duly paid, this insurance bond will be endorsed for the amount of paid-up insurance specified in the table on the preceding page, less the value of any indebtedness on this bond, provided demand is made therefor with surrender of this

bond within six months after such non-payment,—such paid-up in-
surance being payable either if the insured shall die before the 22d
day of October, 1918, or if the insured shall then be living; or, sub-
ject to the same conditions, this bond may be endorsed for the same
amount of paid-up insurance, but payable at death only, with a
guaranteed annual income, beginning on the date specified in the
first 'accumulation benefit,' on the preceding page, equal to four
per cent. of the total amount of premiums paid, taken at the tab-
ular annual rate; or, Second: If any subsequent premium is not
duly paid, and if this insurance bond is not surrendered, as pro-
vided in the preceding clause, the insurance under this bond will,
after the repayment of any indebtedness, be extended without re-
quest or demand therefor, for the amount of $10,000, during the
term provided in the table on the preceding page, payable only if
the insured dies within said term. At the end of said term the in-
surance shall cease, and the amount provided in the last column in
said table will become payable if the insured is then living. Third:
The insurance provided for in the two preceding clauses shall be
based upon completed insurance years only, and shall be subject to
the conditions of this insurance bond, but without further payment
of premiums and without loans, participations in surplus, or pre-
mium return." Further provisions of the policy material to the
issues involved are as follows: "Grace in payment of premiums.
A grace of one month will be allowed in payment of premiums
after this insurance bond shall have been in force three months,
subject to an interest charge at the rate of five per cent. per annum
for the number of days during which the premium remains due and
unpaid. During the month of grace this insurance bond remains in
force, and the unpaid premium, with interest as above, remains an
indebtedness to the company, which will be deducted from the
amount payable under this bond if the death of the insured shall
occur during the month." "Reinstatement in event of lapse. This
insurance bond will be reinstated on written application therefor
within six months after non-payment of any premium, subject to
evidence of good health satisfactory to the company, and payment
of premiums to date of reinstatement with interest at the rate of
five per cent. per annum." "General regulations. All premiums
are due and payable at the home office, unless otherwise agreed in
writing, but may be paid to agents producing receipts signed by the

15

president, vice-president, second vice-president, actuary or secretary, and countersigned by such agents. If any premium is not paid on or before the day when due, this insurance bond shall become void, and all payments previously made shall remain the property of the company, except as hereinbefore provided. . . Any indebtedness to the company, including any balance of the current year's premium remaining unpaid, will be deducted in any settlement of this insurance bond or of any benefit thereunder."

The following appears from the agreed statement of facts in the brief of the evidence: John H. McEachern, the beneficiary named in the policy, died February 8, 1907, and thereupon the policy became payable to the executors, administrators, or assigns of the insured. On November 27, 1908, the insured obtained a loan of $2,620 from the company, and, to secure the loan, executed a "policy-loan agreement," as follows: "Whereas the undersigned has this day duly received from the New York Life Insurance Company $2,620 in cash, as a loan upon policy number 895,953 [the policy in question] issued by said company on the life of Robert A. McEachern, therefore, in consideration of the premises, the undersigned hereby agrees as follows: 1. To pay said company interest on said loan at the rate of 5 per cent. per annum, payable in advance from this date to the next anniversary of said policy, and annually in advance on said anniversary and thereafter. 2. To pledge, and do hereby pledge, said policy as collateral security for the payment of said loan and interest, and herewith deposit said policy with said company at its home office. 3. To pay said company said sum when due, with interest, reserving, however, the right to reclaim said policy by repayment of said loan with interest at any time before due, said repayment to cancel this agreement without further action. 4. That said loan shall become due and payable— (*a*) Either if any premium on said policy or any interest on said loan is not paid on the date when due, in which event said pledge shall, without demand or notice of any kind (every demand and notice being hereby waived), be foreclosed by said company by deducting the amount due on said loan from the reserve on said policy, computed according to the American Experience Table of Mortality, and interest at the rate of four and one-half per cent. per annum; and if after said deduction there is any balance of said reserve as so computed, said balance shall be taken as a single

premium of life-insurance at the published rates of said company at the time said policy was issued, and shall be applied to purchase on the life of the insured under said policy, at the age of said insured on said due date, paid-up insurance for such amount as said balance will buy, payable under the same conditions as the original policy, but without premium return, participation in profits, or further payment of premiums. (*b*) (1) On the maturity of the policy as a death claim or an endowment; (2) on surrender of the policy for a cash value; (3) on the completion of any tontine or accumulation dividend period. In any such event the amount due on said loan shall be deducted from the sum to be paid or allowed under said policy. 5. That the application for said loan was made to said company at its home office in the City of New York, was accepted, the money was paid by it and this agreement was made and delivered there; that said principal and interest are payable at said home office, and that this contract is made under and pursuant to the laws of the State of New York, the place of said contract being said home office of said company."

The annual premiums on the policy were paid to and accepted by the company until the one which became due on October 22, 1911. The insured died January 13, 1912. The plaintiff was appointed executrix of his will on January 27, 1912, and if any one has a right to recover on the policy the right is in her as executrix. On November 29, 1911, a check was received by mail at the Charlotte branch office of the insurance company, as follows: "Red Springs, N. C., Nov. 22, 1911. Carolina Bank & Trust Company, Red Springs, N. C. Pay to the order of New York Life Insurance Company six hundred and twenty-four dollars ($624). For policy 895,953. Robert A. McEachern." Accompanying this check was a letter as follows: "New York Life Insurance Company. Charlotte, N. C. Gentlemen: Enclosed you will find check for six hundred and twenty-four dollars, being the premium due, also interest on loan, etc., on policy No. 895,953. Yours respectfully; [signed] Robert A. McEachern." The letter and check were delivered to the postman after November 22, but before November 29, 1911. On December 1, 1911, the cashier of the Charlotte office of the company, wrote the following letter, which was received by R. A. McEachern on December 6, 1911: "Charlotte, N. C. Dec. 1, 1911. Mr. R. A. McEachern, Atlanta, Ga. Dear Sir: We ac-

knowledge the receipt of your remittance of $624 and beg to inform you that Nov. 22 was the last due date on which, under the terms of the policy No. 895,953, the company could accept payment of the amount which fell due Oct. 22, 1911. The company will be pleased, however, to consider the reinstatement of the policy, if the insured will sign the enclosed application for reinstatement, after answering fully each of the questions contained therein, and have this signature witnessed and return the form at once to this office. Pending the return of the application for reinstatement, and the company's own consideration thereof, the remittance is held subject to your order." On December 8 and December 13 the insured wrote to the company for a copy of the policy, and, on December 28, wrote a letter acknowledging receipt of a copy. On December 18 the company wrote to him, asking that he return the health certificate for the reinstatement of the policy.

The company held the check, under the terms of its letter dated December 1, 1911, until January 16, 1912, when its cashier at Charlotte mailed, by registered mail, a letter addressed to Robert A. McEachern, Atlanta, Georgia, stating that inasmuch as he had failed to furnish the company with the proper requirements for reinstatement of the policy, the check was therewith returned; and further stating: "This check has been held in this office in suspense, subject to your order, pending receipt of requirement as to your present health, and the company's action on said health certificate." This letter was signed: "Geo. R. Stuart, Cashier," and was received by the plaintiff after January 16, 1912. The plaintiff submitted proofs of death, which were accepted as satisfactory by the company, and she was so notified by the company, by letter dated March 11, 1912. This letter contained the following: "The enclosed voucher is to be signed by you as executrix of the estate of the deceased and same is to be returned to this office. Upon receipt of this voucher properly signed, we will be pleased to deliver our check on New York Trust Company for $3,329, in full payment and satisfaction of all claims and demands under this policy." In reply to a request by the plaintiff, through her counsel, for information as to how the above-stated amount was arrived at, the company, on April 12, 1912, wrote to her, giving an illustration of the calculation by which the company ascertained this sum, and showing that it was the amount of paid-

up insurance which the reserve, less the indebtedness, would have purchased on the life of the insured at the date of the lapse, calculated according to terms of the loan agreement.    On April 15, 1912, the plaintiff's attorneys, by letter, demanded of the defendant a settlement in accordance with the terms of the policy, claiming that the policy was a valid subsisting contract up to date of McEachern's death, and stating that they did not believe the defendant could sustain the proposed settlement, etc.    It was further agreed in the statement of facts that the defendant was ready to pay the amount already tendered, and that the following undated and unsigned entry was stamped on the side of the loan agreement: "Foreclosed and paid by deducting the amount of the debt from the value of the policy. ——————— Second vice-president."

The plaintiff filed her suit on June 11, 1912, for $7,380, besides interest, 25 per cent. on the liability, and attorney's fees; alleging that the policy was a valid claim against the defendant for its full face value, less the indebtedness of $2,620, etc.    The defendant answered, denying indebtedness and averring that the insured failed to pay premiums on the policy according to its terms, and, therefore, that at the time of his death the policy was void, etc.    By amendment the defendant alleged that on March 11, 1912, it tendered to the plaintiff $3,329 in full payment, being the amount due under the policy and the loan agreement, etc.    The case was submitted to the court for decision, without the intervention of a jury, on the agreed statement of facts; and judgment was rendered in favor of the plaintiff for $3,329, besides interest and costs.    The plaintiff excepted.

*Robert C. & Philip H. Alston,* for plaintiff.

*Sheppard Bryan, Grover C. Middlebrooks, W. R. Tichenor,* for defendant.

GRAHAM, J.    (After stating the foregoing facts.)

The judgment of the trial judge having been predicated on an agreed statement of facts, the issue is raised as to whether or not, under the principles of law applicable thereto, the plaintiff is entitled to recover any larger sum than the amount awarded by the court.    If the policy sued on was properly foreclosed, under the terms of the loan agreement, after default of the insured and prior to his death, or if the policy was legally converted into paid-up insurance under the first paragraph of the non-forfeiture porvisions

of the policy, then the judgment of the trial judge is correct; because it is undisputed that the principal sum recovered is fully equal to the amount of paid-up insurance which the reserve on the policy, less the indebtedness, taken as· a single premium, would have purchased upon the life of the insured according to the stipulations of the loan agreement, and in conformity with the provisions of the first paragraph of the non-forfeiture clause of the policy.

Taking the issues presented in their natural order, the first question demanding attention is, whether or not, after default and prior to death of the insured, the pledge was properly foreclosed. It is contended by learned counsel for the defendant that when the insured defaulted in the payment of interest on the loan and premium on the bond, the loan agreement made the loan due and payable and caused the pledge to be immediately and automatically foreclosed. In view of the provisions of that agreement, it seems to us this argument is hardly plausible. "The cardinal rule in construing contracts is to ascertain the intent of the parties, so that the whole contract and every part thereof may, so far as they are consistent with the rules of law, be carried into effect." *West* v. *Randle,* 79 *Ga.* 31 (3 S. E. 455). Would it be consonant with the terms of that agreement to say that inaction of the company, after default of the insured, would not leave the matter of foreclosure in suspense,—that failure of the company to take affirmative action would not continue the loan, notwithstanding non-payment of interest or premiums? The company did not so construe the contract, for according to the letters written by the defendant to the insured after the default, the matter of foreclosure was held in suspense "pending the return of the application for reinstatement of the policy and the company's own consideration thereof." Going a step further, if foreclosure was suspended during the negotiations between the defendant and the insured and until the insured's check was returned by the company, as appears from the agreed statement of facts, when and at what moment was the alleged automaton set in motion? What evidence is there in the record that anything occurred prior to the death of the insured, either automatically or otherwise, effectuating the provisions of the loan agreement in reference to the foreclosure? If the pledge was not automatically foreclosed as contended, were any effectual proceedings to foreclose initiated by the company prior to death of the insured?

"Foreclose" has been defined to mean: "to shut out; to bar; used of the process of destroying an equity of redemption." Bouv. L. Dict. Foreclosure of the pledge, under terms of the loan agreement, required some affirmative action on the part of the defendant, amounting to a compliance with the stipulations contained in that contract,—some unequivocal act sufficient to show that the pledge was in fact foreclosed in accordance with the method specified in the agreement. Stratton v. N. Y. Ins. Co., 115 Va. 257 (78 S. E. 639, 640); Brady v. Prudential Ins. Co., 9 Misc. 6 (29 N. Y. Supp. 44); O'Brien v. Prudential Ins. Co., 12 Misc. 127 (33 N. Y. Supp. 67). The language used in the loan agreement obviously required the company, if it foreclosed the pledge under the power delegated, to do something for the benefit of the insured. It was required, after deducting the indebtedness from the reserve, to apply the balance to the purchase of paid-up insurance of a certain kind on the life of the insured, different in some respects from the primary insurance guaranteed in the policy. Was this duty performed? At the time of the death of McEachern, what evidence, either documentary or parol, did he have to show that he possessed a paid-up policy of insurance as provided for in the loan agreement in event of foreclosure? The burden of proof rested upon the defendant to prove the foreclosure, if any occurred, and, yet, as appears from the record, the absence of any satisfactory evidence of foreclosure is conspicuous. Practically the only evidence relating to that issue is the undated and unsigned entry stamped on the side of the loan agreement, and the letters of the defendant, written after the death of the insured; and these letters contain no definite statement as to when the company converted the policy into paid-up insurance.

It is urged in behalf of the defendant that even if there was no foreclosure before McEachern's death, the power of foreclosure, like a power of sale in a loan deed, survives the death of the maker of the instrument and can be exercised at any and all times. Conceding this to be the general rule; in the light of the record it would hardly be compatible with legal and equitable principles to confirm a forfeiture pure and simple by holding that after the policy had become a death claim—after the defendant had become both debtor and creditor with the fund in hand—the company had the right to change the status quo by exercising the power of foreclosure and

thereby deprive the plaintiff of any valid right of action which had accrued to her upon the policy by reason of the death of the insured. By referring to clause (*b*) (1) of paragraph 4 of the loan agreement, it will be seen that just such a contingency was therein anticipated and provided for. The death of the insured was one of the specified events that would render the loan due and payable; and it is therein stated that "in any such event the amount due on the loan shall be deducted from the sum to be paid or allowed under said policy." We are, therefore, constrained to hold, in view of the facts contained in the record, that there was no proper foreclosure of the pledge, and that the loan and loan contract were subsisting at the time of the death of the insured.

The next questions to be determined more directly touch the vital issues of the case. The pledge not having been foreclosed, what valuable rights, if any, did the insured have in the policy at the time of his death? And if he had any such rights, did they survive to the plaintiff as his representative? "No rule in the interpretation of a policy is more fully established, or more controlling and imperative, than that which declares that in all cases it must be liberally construed in favor of the insured, so as not to defeat without plain necessity his claim to indemnity, which, in making the insurance contract, it was his object to secure." May on Insurance, 182; *N. Y. Life Ins. Co.* v. *Babcock,* 104 *Ga.* 77 (30 S. E. 273, 42 L. R. A. 88, 69 Am. St. R. 134); *Arnold* v. *Empire Ins. Co.,* 3 *Ga. App.* 685 (60 S. E. 470); *Mut. Life Ins. Co.* v. *Durden,* 9 *Ga. App.* 797 (72 S. E. 295). It is undisputed that McEachern did not pay the premium falling due October 22, 1911, and that it was not paid during the thirty days of grace, to wit, on or before November 22 following. The check sent by him to the company and held by it till January 16, 1912, was not received and accepted as payment; nor did the holding of the check amount to a waiver; for the company, upon receipt of the check after expiration of the grace period, immediately advised the insured that it could not accept the check as payment, and that it was held subject to his order, pending the return of the application for reinstatement. Therefore, as the case stands, the premium falling due October 22, 1911, was not paid and the policy lapsed. On January 13 McEachern died, two months and twenty-two days after the default, and more than thirteen years after the issuance of the policy.

The non-forfeiture clause of the policy provided that after the policy had been in force full three years, if any subsequent premium was not paid it would be converted into paid-up insurance, provided demand was made therefor with surrender of the policy within six months; or, if the policy was not surrendered as above provided, the insurance under the policy would, after repayment of any indebtedness, be extended for the full amount of $10,000 during the term provided for in the table on the preceding page. There were two forms of insurance provided for,—primary and secondary. So long as the premiums were duly paid the insured was entitled to the primary insurance, which if carried to maturity would have entitled the insured to certain accumulation benefits therein provided for, in addition to the face value of the policy. When the policy lapsed, as above stated, his right to primary insurance was forfeited, and the company's liability was remitted to the secondary insurance provided for in the non-forfeiture provisions above quoted, to wit, paid-up insurance or extended insurance. During the thirteen years preceding the lapse, the premium paid each year by the insured was not only paying for current insurance, but was building up a reserve to the policy, which paid for, and legally entitled him to, the secondary insurance guaranteed by the policy in case the lapse should occur by failure to pay premiums. He was as much entitled to the secondary insurance after the lapse as he was to the primary insurance prior to the lapse. He had paid for both. The privilege of election between the two forms of secondary insurance—paid-up and extended insurance—after lapse, was not a mere gratuity on the part of the company. The insured under the terms of the policy was simply allowed, in one of two ways, the privilege of enjoying the benefit of a reserve which he had accumulated by paying from year to year more than the sum necessary to carry current insurance. Therefore, by every rule of reason it would seem that this right of election between the two forms of secondary insurance, guaranteed to the insured by the non-forfeiture provisions of the policy, was a valuable property right, which, if existing at the time of his death, survived to his legal representative. And it has been so held by this court, and by some courts of other jurisdictions. *Veal v. Security Mutual Life Ins. Co.*, 6 *Ga. App.* 721 (65 S. E. 714); *Winchell v. John Hancock Mut. L. Ins. Co.*, Fed. Cas. No. 17866; *Nielson v. Prov. Assur. Soc.*, 139 Cal. 332 (73 Pac. 168, 96 Am.

St. R. 105) ; New York Life Ins. Co. *v.* Noble, 34 Okla. 103 (124 Pac. 612, 45 L. R. A. (N. S.) 391) ; Lenon *v.* Mutual Life Ins. Co., 80 Ark. 563 (98 S. W. 117, 8 L. R. A. (N. S.) 193, 10 Ann. Cas. 467) ; N. Y. Life Ins. Co. *v.* Curry, 115 Ky. 100 (72 S. W. 736, 61 L. R. A. 268, 103 Am. St. R. 297) ; Stratton *v.* N. Y. L. Ins. Co., supra.

It is contended that when the policy lapsed for non-payment of premiums, it became forfeited and was no longer in force, etc. That is true in a qualified sense only. It lapsed and was forfeited in so far as the primary insurance was concerned, but remained in force to the extent necessary to secure to the insured the secondary insurance therein provided for. The policy stipulated six months from date of the lapse as the period in which demand for paid-up insurance should be made, but no limit of time was fixed within which the insured was required to avail himself of the extended insurance. The question of time, however, is not involved in the case at bar. The insured died, proofs of death were duly submitted, and the full value of the policy demanded—all within six months from the date of the lapse. By October 22, 1911, McEachern had paid thirteen annual premiums, amounting to $6,357 in actual cash, and the reserve of the policy had accumulated to the extent that he was entitled, under the terms of the policy, to seven years extended insurance, without further payment of premiums; the only condition annexed thereto being "repayment of any indebtedness." His right to pay the loan at any time before the foreclosure of the pledge, and thereby eliminate that condition, seems to be indisputable. The $2,620 which he had gotten from the company was not given back to him as a part of the reserve he was accumulating. That sum was loaned to him by the company from its funds, and he was required to pay interest thereon the same as if he had borrowed it from any other lender. Incurring the debt did not extinguish the policy or any part thereof. He did not sell the policy to the company; he simply pledged it as security. All rights guaranteed to him by the policy continued, subject to the company's right to have the indebtedness paid, and its power to foreclose the pledge for that purpose.

It has been said that when an insurance company lends money to one of its policyholders, it is in no different position from any other lender of money; and in lending its money it is subject to

the same rules governing banks, trust companies, and other corporations engaged in lending money. Stratton *v.* N. Y. L. Ins. Co., N. Y. Life Ins. Co. *v.* Curry, supra. The pledge not having been foreclosed, McEachern, at the time of his death, had the lawful right to pay to the company the money he had borrowed, with the interest thereon, and thereby, under automatic provisions of the policy, come into the unconditional enjoyment of the extended insurance, for which he had already fully paid. This right, like an equity of redemption, was not a mere personal privilege, but a valuable property right surviving to the representative of the insured; and when the policy matured by reason of the death of McEachern, it became a death claim impressed with the respective rights of the parties. The plaintiff having made demand for the full value of the policy, payment of the indebtedness with other funds was not a condition precedent to recovery. The defendant being thereby placed in the attitude of both debtor and creditor with the fund in hand, the plaintiff was entitled to recover the amount of extended insurance stipulated in the policy, less the loan and interest thereon.

As the rulings herein made will leave the case pending in the city court for further trial, it is not necessary to review other issues raised by the assignments of error.

*Judgment reversed. Roan, J., absent.*